**Brenna K. Legaard, OSB #001658**
Email: blegaard@schwabe.com
**Jeffrey S. Eden, OSB #851903**
Email: jeden@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Facsimile: 503-796-2900

**Karen G. Johnson-McKewan**, *pro hac vice pending*
Email: kjohnson-mckewan@orrick.com
**Robert S. Shwarts**, *pro hac vice pending*
Email:  rshwarts@orrick.com
**Erin M. Connell**, *pro hac vice pending*
Email: econnell@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2625
Telephone: 415-773-5700
Facsimile: 415-773-5759

Attorneys for Plaintiff Oracle America, Inc.

## THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **ORACLE AMERICA, INC.,** a Delaware Corporation,<br><br>                Plaintiff,<br><br>   v.<br><br>**OREGON HEALTH INSURANCE EXCHANGE CORPORATION**, a Public Corporation, dba **COVER OREGON**; and DOES 1-25, inclusive,<br><br>                Defendants. | No. 3:13-cv-1279<br><br>**COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Oracle America, Inc. ("Oracle ") brings this Complaint against Defendant Oregon Health Insurance Exchange Corporation, doing business as Cover Oregon ("Cover Oregon"), for breach of contract and quantum meruit based on Cover Oregon's continued use of software developed by Oracle despite Cover Oregon's failure to pay approximately $23 million for services Oracle rendered.  Oracle is a company with a 30-year history of successfully developing and implementing some of the most complex technical systems in the world, including the health insurance exchanges of at least a half dozen states.   Oregon hired Oracle— among many others—to help build Oregon's health insurance exchange, and Oracle worked at Oregon's direction on that project.  Since October 1, 2013, hundreds of thousands of Oregonians have been enrolled in health insurance or Medicaid through the use of the software that Oracle and others built.  That, however, is a fact most Oregonians do not understand, because when the press reported that the exchange was not accessible for consumer self-service on October 1, 2013, public officials chose not to give a measured, fully informed response.  Cover Oregon and public officials could have done two things in the face of those press reports: (a) own up to the management and technical challenges they had encountered and commit to a plan for resolving them; or (b) blame someone else.  They chose the latter, and they fixed their sights on Oracle.  While flogging Oracle publicly, Cover Oregon continued privately to ask for Oracle's help.  (Indeed, it continues to this day to seek Oracle's technical help with the project).  Oracle gave that help for many months, in spite of the public excoriation, because it was committed to helping Cover Oregon complete the project and because Cover Oregon repeatedly promised to pay Oracle for its services.  In the end, though, Cover Oregon reneged on its promises, thus prompting this lawsuit.

Page 2 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

Oracle seeks damages and any such other relief as the Court may deem proper.  Oracle alleges the following based on personal knowledge and on information and belief as to the acts of others:

## PARTIES

1.     Plaintiff Oracle is a subsidiary of Oracle Corporation, and it is a Delaware corporation whose principal place of business is Redwood City, California.  Oracle develops and licenses certain intellectual property, including enterprise software programs and related services.  Oracle is the world's leading supplier of enterprise hardware and software systems and related technical support and consulting services for those systems.  Oracle's enterprise software includes the "Oracle Enterprise Architecture" solution, the "Oracle Policy Automation" solution, and the "Siebel Customer Relationship Management" applications, all of which can be customized to meet the needs of customers.

2.     On information and belief, Defendant Cover Oregon is an Oregon public corporation under ORS 741.001(1) with its principal place of business at 16760 S.W. Upper Boones Ferry Road, Suite 200, Durham, in Washington County, Oregon 97224.  Cover Oregon does business in the District of Oregon.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction based on diversity under 28 U.S.C. § 1332(a) as Oracle, on the one hand, and Cover Oregon on the other, are citizens of different states, and the amount in controversy exceeds $75,000, excluding interest and costs.

4.     Venue in this District is appropriate because Cover Oregon has consented to venue in this District in its contract with Oracle, including the Oracle License and Services Agreement signed by the parties on or around March 14, 2013, in which Cover Oregon agreed:

> This agreement is governed by the substantive and procedural laws
> of Oregon and you and Oracle agree to submit to the exclusive
> jurisdiction of, and venue in, if in state Courts, in the Circuit Court
> of the State of Oregon for Marion County or, if in federal courts,

the United States District Court for the District of Oregon, in any
dispute arising out of or relating to this agreement.

5.      Venue in this District is also appropriate under 28 U.S.C. § 1391 as Cover Oregon

is headquartered in Durham, in Washington County, Oregon.

## FACTUAL ALLEGATIONS

### THE HISTORY OF THE OREGON HEALTH INSURANCE EXCHANGE PROJECT

6.      On March 23, 2010, President Obama signed into law the Patient Protection and

Affordable Care Act ("ACA"), establishing the legal foundations for states to create health

insurance exchanges by which individuals and small businesses could compare and purchase

health insurance policies and, where eligible, obtain federal subsidies for premium payments.

7.      At the time the ACA was enacted, the state of Oregon's Department of Health and

Human Services ("DHS") was already engaged in an ambitious IT project of its own to

modernize its delivery of health and human services to low-income Oregonians.  Oregon was

preparing to undertake what it called its "Modernization" project ("Modernization Project")

designed to upgrade Oregon's Internet-based health and human services information technology

system, by which Oregon would provide web accessibility, for both consumers and caseworkers,

to its social services programs, such as the Supplemental Nutrition Assistance Program,

Temporary Assistance for Needy Families, and Medicaid.

8.      In 2009, while the DHS Modernization Project was in its early stages, the Oregon

Legislative Assembly created the Oregon Health Authority ("OHA") to which it transferred

some of the programs long resident under the DHS umbrella, including the state's health-related

programs.  The transition was expected to take two years to complete, from 2009 to 2011.  As a

result of that redistribution of work, the Modernization Project included elements of

programming that spanned both agencies, necessitating substantial coordination between those

two organizations and development of a shared administrative services system for the two

entities.

Page 4 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

9.    Passage of the ACA in the midst of the DHS/OHA transition presented Oregon with another massive technical and organizational challenge:  creating its own health insurance exchange.  Oregon decided not only to build its own exchange, but to integrate it with its to-be-modernized health and human services programs.  Oregon thus undertook two major information technology projects at once, at least one of which had no established template or precedent, and whose legal parameters were still a work in progress.

10.    Oregon compounded the already high level of difficulty of its undertaking with at least three more decisions:

(a)    Rather than engage the services of an experienced system integrator—in effect, a general contractor to manage the massive project—Oregon decided to manage the project by itself, despite having little or no experience with projects of such novelty, complexity or scale.  That decision was akin to an individual with no construction experience undertaking to manage the processes of designing and building a massive multi-use downtown skyscraper without an architect or general contractor, instead engaging *and managing* dozens of separate subcontractors with different specialties to build different parts of the project.

(b)    Oregon was already developing the Modernization Project across two bureaucracies—DHS and the recently created OHA—and added development of the health insurance exchange to OHA's responsibilities. Then, when OHA ran out of federal grant money to build the exchange (which was then still very much a work in progress), it hastily transferred responsibility for construction of the exchange to the newly created entity, Cover Oregon, which had qualified for substantial federal grant money intended to sustain its *operation* of the exchange.  Using funds supplied entirely from the federal government, the state thus undertook a multi-part project of unprecedented size and complexity for which it had no expertise, divided responsibility for its management and decision-making among multiple organizations, and decided to forgo hiring any experienced professionals to lead the project.  It then abruptly transferred the uncompleted work to a separate entity when the state ran out of federal money.  In other words, decisions about how to erect that downtown skyscraper without an architect or a

Page 5 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

general contractor were now going to be made by a *group* of inexperienced people who could not agree on how to make decisions, let alone which decisions were most important.  That same group of people was also going to direct the work of a large collection of subcontractors, each of whom played a different role in relation to the projects, and all of whose work required coordination.  Oracle was just one of many contractors engaged for these projects, a list that included Deloitte & Touche, Eagle Creek Software Services, Speridian Technologies, Point B Management Consultants, KPMG, Maximus Inc., Cognosante, LLC, TahoeBlu, Inc., Purple Squirrel, Walsh & Associates, LLC, Radha Consulting, and a variety of individual consultants. (One of those contractors—Maximus, Inc.—was hired for the express purpose of enabling OHA, and later Cover Oregon, "to understand known and probable risks, and establish priorities for mitigation/remediation strategies."  Maximus dutifully reported on the risks, but OHA and Cover Oregon seemed largely to ignore the contents of those reports.)

        (c)     When OHA handed the health insurance exchange (sometimes referred to as "HIX") project to Cover Oregon just a few months before the October 1, 2013 open enrollment start date under the ACA, Cover Oregon decided that it would operate in a technological environment (comprised of hardware and software) that was entirely separate from that being used for the Modernization Project.   That decision alone caused substantial additional costs, weeks of delays, and wholly unnecessary additional complexity.  Oracle is informed and believes this decision was the direct result of bureaucratic dysfunction between DHS and OHA, and those two agencies' inability to work with the brand new Cover Oregon.

       11.     Throughout the time that Oracle worked for DHS, OHA, and Cover Oregon, all of them ignored repeated warnings from Oracle and their own advisors that the project was in trouble for reasons only they could correct, including:

        (a)     The government bureaucracies and Cover Oregon worked poorly together. They did not agree on work priorities, they competed with one another for resources and in decision-making, and they failed to provide authoritative direction to all of the contractors working on the project.  Communications among the different entities were "ineffective and at

Page 6 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

times contentious," according to a report commissioned by Oregon's governor.   For example, at

one point, OHA's Chief Information Officer complained to Oracle personnel that Cover

Oregon's efforts were "becoming highly disruptive to the Modernization effort," and that her

team felt "they are being run over" by Cover Oregon.  As a result, one organization would make

decisions without taking account of implications of that decision for the work being performed

for the other organization; the result was often duplication of effort and rework.  That

dysfunction endured throughout the project.  As late as mid-September 2013—just two weeks

before the start of the federally-mandated open-enrollment period—Maximus issued a report in

which it observed that the overall "business transformation/integration between OHA and CO is

not being tracked like a formal project.  Typically a project of this size would have specific

governance reporting, charter, scope, tasks, milestones, deliverables, and deadlines for the

interagency work that is to be accomplished both operationally and technically."  The risk

Maximus identified that flowed from this was that Cover Oregon could not be sure that the

project would be implemented in the expected timeframe.

        (b)      Cover Oregon failed to make timely decisions either alone, or with OHA

and DHS, about the health insurance exchange's functional requirements, which serve to provide

the overall structure and scope of the IT project.  On a large project, it is critical for the system

integrator to define functional requirements early on in the project and adhere to those

requirements.  With Cover Oregon and the state agencies acting as the system integrator, the

obligation to provide those functional requirements rested solely with them, and not with Oracle.

Indeed, the organizations involved in the project could not even agree on a single process for

defining those functional requirements.  In late January or early February 2012, a group of state

employees took a 60-day "retreat" for the express purpose of articulating the project's

requirements, and they returned empty-handed.  The quality assurance consultant, Maximus,

Inc., reported on the lack of fully articulated requirements in its March 2012 report

("Requirements baseline should have been completed and approved by the customer at this phase

in the project").  While Maximus characterized the 60-day retreat as "a step in the right

Page 7 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

direction," it expressed doubt about the likely efficacy of the effort, since it was not clear that

key stakeholders at OHA or DHS were even involved.  By June 2012, Maximus reported:

> HIX Corp. [later known as Cover Oregon] did not perceive that
> requirements had been adequately defined and in early February of
> 2012, it was announced that they were undertaking an effort to
> define the business requirements. This effort was originally
> defined as a 60 day effort, but it has taken longer than originally
> stated and full requirement definition is not expected to conclude
> until mid to late June. To date, a detailed schedule of this effort has
> not been made available to the MAXIMUS Team and it is our
> understanding that it is under development.

12.    This failure to make (or stand by) essential decisions persisted for the duration of

the project.  At one point, then interim director of Cover Oregon, Dr. Bruce Goldberg, confided

to Oracle personnel that getting Cover Oregon personnel to make decisions was "like pushing a

rope."

(a)    Cover Oregon and state agency representatives involved in the project

changed their minds frequently about the work they wanted performed and how they wanted it

completed, and they did not follow appropriate channels within either their own decision-making

organizations or the Oracle team to communicate desired changes.  Oracle software developers

found themselves asked to perform on-the-spot code changes to meet *ad hoc* requests from

Cover Oregon employees (a phenomenon Cover Oregon's Chief Technology Officer himself

acknowledged was "short circuiting our processes"), and at least one Cover Oregon employee

attempted to implement his own changes to otherwise final code.  The consequences of these

uncontrolled changes and shifting priorities were entirely predictable.  Although Oracle

attempted to persuade its customers to implement and enforce controls on its change processes,

Cover Oregon did not heed Oracle's advice, and instead scolded Oracle for overstepping its

bounds with respect to project management.  The following exchange between Oracle's Chief

Corporate Architect, Edward Screven, and Cover Oregon's Chief Technology Officer, Garrett

Reynolds is illustrative of the problem:

> From: Edward Screven [mailto: [*address redacted*]]
> Sent: Thursday, January 16, 2014 5:15 PM
> To: Reynolds Garrett
> Cc: Goldberg, Bruce; Karjala Aaron
> Subject: Urgent: Administrative Access to Siebel
>
> Garrett,
>
> Oracle employees on site in Durham report that in a meeting today you stated that you now have Siebel Administrator privilege, and you have used that privilege to directly make environment and application changes to the production environment. Is this correct?
>
> Following established change control procedures is essential. Making any change to production without following proper procedure puts the system at risk, both at the time of the change and later, during upgrades. If you have made such changes, please send a written description of each change, including when you made it. Also, please do not make any more changes.
>
> From past email you have written, I gather you believe you understand Siebel so well that you can make changes on your own, without involving others or following process. But even trivial changes can result in confusion that leads to serious mistakes down the road, and even an expert can make mistakes. Recall that your proposed procedure to complete migration of data elements to data vault would have resulted [in] data loss.
>
>   - Edward
>
>                           …
>
> On 1/16/2014 6:28 PM, Reynolds Garrett wrote:
> I thought Cover Oregon paid for and owned the system....
>
> Thanks
>
>
> B. Garrett Reynolds
> Chief Technology Officer
> Cover Oregon   |   www.CoverOregon.com
> *[address redacted]*   |   *[redacted]*

13.     Cover Oregon had ample and repeated warnings that the healthcare exchange might not be fully functional for consumers on October 1, 2013, the date the state and federal insurance exchanges were required to go live under the ACA.  Maximus issued monthly reports throughout most of the project to Cover Oregon, and it warned about trouble with development of the insurance exchange from the start.  For example, in March 2012, Maximus wrote:

> Detailed and maintainable functional and technical requirements are critical to the success of the project. As of February 2012, gaps in requirements are unknown. There have been multiple attempts to clarify requirements, but as yet none have been adequate. In an attempt to address some of the past failed efforts, a new requirements process (called the '60-day' Requirements Process) was introduced on 02/08/12 and will be 'owned' by HIX Corporation rather than HIX-IT. Clearly articulating ownership of this process is a step in the right direction. However, the involvement of other stakeholders, including OHA and DHS, are *[sic]* not yet clear. Nor is there a way as yet to determine if the 60 day time frame is realistic.

A year later, the March 2013 Maximus report still flagged the lack of solid requirements as a risk:

> With the project deadline less than 1 year away and the lack of a stable and experienced organization, development and delivery teams within OHA as well as the requirements delay within [Cover Oregon], the probability of missing the target date is currently an issue.

In May 2013, Cover Oregon's then-executive director, Rocky King, admitted requirements were still not adequate and asked Oracle for help in finalizing the technical requirements:

> The on the ground Oracle team has informed Cover Oregon that we still need to tighten up requirements in some areas. When we looked into it, we found three areas where requirements still need to be fully developed. These include the back office customer service areas, some global user interface functions and security policies. When Cover Oregon looked into it further, we found that functional and technical design has not been fully updated since October of 2012. This poses issues with system integration testing, and also puts Cover Oregon at risk due to not having a fully documented system. Cover Oregon requests that Oracle helps to tighten up any remaining requirements as well as puts focus on completing technical documentation as soon as possible by bringing in additional resources. We do not want to divert the on-the-ground developers and analysts.

This request was an extraordinary one: Cover Oregon was the owner of the project and therefore responsible for making decisions about what the exchange would and would not do. The parties' contracts made it abundantly clear that Oracle had *no role* in establishing the functional requirements for the exchange, and Cover Oregon should have finalized them long before May 2013.

14.    In late July 2013—just two months before the October 1, 2013 deadline—Oracle made a presentation to the Cover Oregon board in which it explained that Cover Oregon *still* had not completed its work on functional requirements for the exchange, and it noted that there was only limited time remaining for final functional and integration testing. Without finalized requirements and complete use cases, Oracle could perform only limited testing (with respect to the work and areas of the site that had been completed), but not end-to-end performance testing. The report to the Cover Oregon board stated that the project was at substantial risk. The Maximus report for July reiterated that warning, putting the overall risk level for the project at "high." It explained in its executive summary:

> Please note, that while progress was made during the month, the progress was not considered significant enough to lower the overall risk of the whole endeavor. In other words, progress in some areas since last month is offset by the fact that there is one less month until the federally mandated deadlines. Additionally, each rating category will carry a different relative weight when assessing the overall risk level of the effort. For example, while 10 out of 16 Quality Rating Categories are medium (yellow) or low (green), critical categories including "Scope," "Schedule," and "Inter-Org Coordination" remain high (red), which drives the overall high (red) risk assessment.

15.    Cover Oregon continued to ignore most of those warnings until virtually the eve of the deadline. Just two weeks before the deadline, an Oracle consultant advised Cover Oregon's then Chief Information Officer, Aaron Karjala, that it was time to stop issuing change orders, that two more had just been "auto-approved" with demands for immediate implementation, and both were likely to create more problems than they solved. The message reported:

> As we all knew would happen, as 10/1 approaches, stakeholders
> are starting to throw everything into the wheelbarrow with hopes
> of getting it in. I'm also seeing [Cover Oregon] members coming
> down to the Training Room and interacting with the developers,
> speaking to these new requirements. We've had the CR [change
> request] process for some time and though it's not without its
> flaws, it has been pretty functional in adding order to the
> requirements channel. I feel like when we need that order most we
> are abandoning it. When the business walks downstairs and taps
> developers to talk new requirements with them it is a distraction at
> best and at worst we lose momentum and focus on priority items.

Maximus confirmed the truth of Oracle's complaint about Cover Oregon's ineffective change

control process. In its report issued two weeks before the October 1 deadline, Maximus reported

that "[u]nauthorized changes are still making their way into the system."

16.  On September 18, 2013—mere *days* before the October 1 deadline—Cover

Oregon's Executive Director still had not grasped the deep substantive challenges to going live

that his organization had created in the development process. He repeatedly conveyed concern

about the "sizzle not the steak" of the massive IT project, as evidenced by a lengthy email he

wrote to an Oracle consultant in which he described his desire to make the website *look* good,

and apparently assumed the ongoing functional challenges would resolve themselves:

> Probably everyone will disagree with me[,] my staff, yours,
> consultants actually *[sic]* I know they would disagree with me –
> but step back and have a discussion with Aaron [Karjala]. Take a
> customer perspective rather than an IT perspective. Again, I do
> not want to detract from the priority 1's that  must be done to go
> live 10/1 but damn, if the road is going to be be *[sic]* bumpy, <u>let
> me at least be driving a good looking car.</u>

Emphasis in original.

17.  Starting in late August 2013, Oracle added substantial additional resources to the

project at Cover Oregon's request in hopes of accelerating the pace of work, instilling in the

Cover Oregon employees a greater sense of discipline about completing requirements and use

cases, and stopping the constant change orders, both formal and informal. Over several months,

Oracle committed, among others, its Chief Corporate Architect and members of his team,

members of Oracle's "A Team," (a highly specialized technical team comprised of enterprise

architects, solution specialists and software engineers), representatives of Oracle Laboratories,

Page 12 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

members of the Testing and Release Management Teams, as well as additional subject matter experts in testing, release management, and the software products being deployed, to assist on the project.  Cover Oregon's incapacity for lasting decision-making or project discipline, however, continued to frustrate Oracle's efforts at every turn.  Nevertheless, Oracle continued to work at Cover Oregon's request, trying to drive the project to a conclusion.

18.     In the months leading up to October 1, and continuing thereafter, Oracle did its best to ensure that the most important pieces of the website—including eligibility determinations and actual enrollment into programs—worked for Oregonians during the open-enrollment period.  At a high level, a fully functioning exchange had to include four principal functions: (a) a "citizen self-service" portal; (b) a portal through which Community Partners and Agents, as well as Customer Service Representatives, could gain access for customers; (c) eligibility determination and enrollment functions; and (d) "back-office" operations for billing.  Of these, the most important were the second and third pieces that would enable insurance professionals to process applications for individual customers, assess their eligibility and get them enrolled in plans.  This is where Oracle tried to focus its efforts, often in spite of Cover Oregon's demands.

19.     Despite the project's technical and bureaucratic challenges, a website was produced that enabled Cover Oregon and the state's agencies to enroll more than 430,000 Oregonians in health insurance or Medicaid under the ACA, as Cover Oregon's management reported in June 2014.  While the consumer-facing, self-service portal did not open during the initial open-enrollment period, Community Partners and Agents, and Customer Service Representatives were able to use the site to enroll Oregonians.

20.     By February 2014, a health insurance exchange website existed that included the citizen self-service functionality.  Cover Oregon did not disclose that information to the public and did not open the working self-service portal for individuals, for unexplained reasons of its own.  Between February and mid-June, Oracle continued to work (at Cover Oregon's request) on completing the back-office functionality and improving the other functionality that was already in place.

Page 13 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

### THE SMEAR CAMPAIGN

21.     Though the state and Cover Oregon succeeded in enrolling a very large number of Oregonians in health care coverage, the failure to deliver a working citizen self-service portal on October 1, 2013 was a political embarrassment for Governor Kitzhaber, who immediately looked for places to lay the blame.  Among those who have lost their jobs at OHA or Cover Oregon over this project are Carolyn Lawson, OHA's Chief Information Officer; Rocky King, Cover Oregon's Executive Director; Bruce Goldberg, Cover Oregon's Interim Executive Director; Aaron Karjala, Cover Oregon's Chief Technology Officer; and Triz delaRosa, Cover Oregon's Chief Operating Officer.   Carolyn Lawson was the first to go, and after destroying her professional reputation, the Governor quickly turned his sights on Oracle, and he set out systematically to vilify the company in the media.

22.     Ms. Lawson refused to accept her scapegoating quietly, however.  She issued a tort claim notice on March 17, 2014, in which she alleged that several individuals associated with Cover Oregon and OHA attempted to deflect responsibility for the problems with Cover Oregon "by organizing, encouraging, allowing, tolerating and/or engaging in a substantial cover-up, the purpose of which was to protect selected individuals … while unfairly and untruthfully pointing the finger at others."  In that same notice, she went on to explain that the conspiracy she observed "centered on a 'core story'" that the exchange failed to launch properly for two reasons: first, that Ms. Lawson had mismanaged it; and second, that "Oracle, which had been hired to build most of the Exchange's infrastructure, committed serious and fatal blunders in its work."  According to Ms. Lawson, when she declined to go along with the plan to blame Oracle, she was herself targeted.  Her tort claim notice alleges that one OHA employee told her, "Somebody has to be held to blame for this—it's going to be Rocky [King], or it's going to be Oracle, or it's going to be you.  *We want it to be Oracle*, but it can be you if you want." (Emphasis added).

23.     While Oracle continued to work on the exchange at Cover Oregon's request, Governor Kitzhaber embarked upon a months-long campaign to blame Oracle for OHA's and

Page 14 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

Cover Oregon's mismanagement of the health insurance exchange project.  In furtherance of that campaign, Governor Kitzhaber held several interviews and press conferences during which he blamed and criticized Oracle for the problems with the exchange.  Critical to Governor Kitzhaber's scapegoating was the threat of litigation against Oracle.  During a January 9, 2014 press conference, for example, Governor Kitzhaber announced that he hired First Data to conduct an "independent assessment" of the Cover Oregon project, asserting First Data's report would determine, in part, whether Oregon would sue Oracle.  Cover Oregon privately continued to request Oracle's help.  Oracle, believing that the best solution for Oregonians was to focus on completing the project, continued to work, quietly and without public retort, in spite of the constant public slander.

24.    When First Data's report came out, it attributed a large part of the problems to Cover Oregon's mismanagement of the project including its failure to hire a system integrator.  Governor Kitzhaber admitted "oversight was a problem at Cover Oregon…"  He later admitted in his May 29, 2014 letter to Attorney General Rosenblum that OHA's and Cover Oregon's "decisions contributed to the failure to deliver a working website…."  These admissions did not slow his campaign against Oracle; in a March 20, 2014 press conference, Governor Kitzhaber again blamed Oracle for the Oregon Health Exchange project's shortcomings and repeated his threat to sue the company.  His campaign culminated on May 29, 2014 when he made a surprise appearance before a committee of the Oregon Legislative Assembly excoriating Oracle for its work and demanding that the Attorney General file suit.  Even as the Governor threatened to sue Oracle, Cover Oregon continued to ask for Oracle's help and signed contract extensions, and Oracle continued to work.  Indeed, as recently as July 25, 2014, Cover Oregon contractors asked Oracle to supply personnel as subcontractors to assist them on the project.

25.    While Oregon continues to threaten Oracle with lawsuits aimed at demanding the return of funds paid to the company for its work, Oracle continues today to render managed cloud services to Cover Oregon.

26.    The Oregon Department of Justice has not filed the Governor's long-threatened lawsuit.  The slander against Oracle thus remains hanging in the political air in Oregon.


### THE CONTRACTS

27.    The relationship between Oracle and Cover Oregon is defined by the contracts between them by which the parties defined their respective rights and responsibilities.  Oracle has performed its obligations under those agreements, but Cover Oregon has not.

28.    As of April 30, 2013, OHA ran out of money for the insurance exchange project. Because Cover Oregon had received substantial federal funding to *run* the exchange, OHA and Cover Oregon agreed to transfer the exchange project ahead of schedule and, on or about May 1, 2013, Cover Oregon assumed ownership of the project and responsibility for managing the insurance exchange project and its many subcontractors from that point forward.

29.    In anticipation of  transferring the health insurance exchange project to Cover Oregon, on or about March 14, 2013, Cover Oregon and Oracle entered into an Oracle License and Services Agreement  ("OLSA"), a true and correct copy of which, including all amendments, is attached hereto as Exhibit A.  Under the Cover Oregon OLSA, Cover Oregon would receive— *upon payment for services*—a non-exclusive, non-assignable right to use the software Oracle developed and delivered to Cover Oregon under the OLSA:

> *Upon payment for services*, you have the non-exclusive, non-assignable, royalty free, perpetual, limited right to use for your internal business operations anything developed by Oracle and delivered to you under this agreement; however, certain deliverables may be subject to additional license terms provided in the ordering document.

(Emphasis added).[1]

---

[1] Oracle also signed an OLSA with OHA and DHS in November of 2011 that contained the same language requiring payment for services before OHA/DHS would have the right to use software that Oracle developed.

30.     Cover Oregon and Oracle also entered into an Amendment to the OLSA,
containing, among other terms, a "Source Code" provision stating that all source code Oracle
delivered to Cover Oregon was subject to the terms of the OLSA and any application order and
program documentation.  Thus, it was always the parties' intent, as memorialized in the OLSA,
that Cover Oregon would not obtain a right to use any of the software until it paid for Oracle's
services.  Oracle continued to retain all ownership and intellectual property rights to the
programs and software it developed and delivered to Cover Oregon.

31.     Cover Oregon also executed several "Ordering Documents" identifying the
services Cover Oregon requested and the fees Cover Oregon had agreed to pay Oracle for those
services.  As in the OLSA, Cover Oregon agreed in each Ordering Document that—*upon
payment for services*—Cover Oregon would receive a non-exclusive, royalty-free license to the
software Oracle developed for Cover Oregon:

> *Upon payment for services*, Cover Oregon shall have a royalty-
> free, nonexclusive, and irrevocable license for Cover Oregon and
> the U.S. Federal Government to reproduce, publish, or otherwise
> use anything developed and delivered under this Ordering
> Document resulting from the services provided hereunder and to
> authorize others to do the same solely for the development and/or
> use of a government-operated health insurance exchange and
> eligibility automation system in accordance with the Affordable
> Health Care Act and applicable regulations of Federal purpose.
> You shall not have any other rights in or to anything developed and
> delivered to you hereunder.

(Emphasis added).  True and correct copies of the Ordering Documents for Oracle consulting
services are attached hereto, collectively, as Exhibit B.

32.     Each Ordering Document also referenced and included a "Time and Materials
Exhibit" ("T&M Exhibit"), identifying the specific services Cover Oregon had requested.  Under
the T&M Exhibits, Cover Oregon agreed that: (a) Oracle would provide its services on a time
and materials basis, (b) Cover Oregon would pay for all time spent performing such services, and
(c) Oracle would "assist" Cover Oregon on the project and work at Cover Oregon's sole
direction.

Page 17 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT

33.    It is not unusual for consultants such as Oracle to work on a time and materials basis.  Indeed, many consultants, including Oracle, have done so on many projects, including projects for public sector customers.  The reason Oracle worked on a time and materials basis—and not for a fixed fee—is a simple one.  While everyone involved understood the ultimate objectives of the projects—to create a fully-functional, web-accessible, self-service health insurance exchange, to modernize the state's provision of its broader health and human services offerings, and to integrate the multiple systems involved—Cover Oregon and the state agencies had no real plan for how, exactly, those projects would operate or how they would work together.  Without a fixed scope for the project—the equivalent of architectural blueprints—no contractor could reasonably be expected to agree to work on a fixed-fee basis.  Because only DHS, OHA and, ultimately, Cover Oregon, could resolve the uncertainties regarding the overall scope and structure of the massive project, and because only Cover Oregon and the state agencies could demand changes in the project, those entities properly bore the inherent risks associated with failing to resolve them in a timely way.

34.    In about November 2013, Cover Oregon stopped paying its invoices and refused to sign Ordering Documents for the services it had requested and was continuing to request from Oracle, forcing Oracle to either risk working without payment or abandon the project.  By the end of February 2014, Cover Oregon had executed Ordering Documents for Oracle consulting services rendered through August 2013, but not for services rendered between then and the end of February 2014.  In that period, at Cover Oregon's request, Oracle continued to render consulting services to Cover Oregon, and it committed substantial additional resources to the project outside of its consulting organization, in the form of, among others, its Chief Corporate Architect and members of his team, members of Oracle's A Team, representatives of Oracle Laboratories, as well as additional subject matter experts in testing, release management, and the products at issue.  Oracle repeatedly asked Cover Oregon to pay its outstanding invoices and execute Ordering Documents for the work it was requesting so that Oracle could render invoices, and Cover Oregon promised on multiple occasions that it would do so.  Governor Kitzhaber

personally made multiple promises to Oracle that the company would be paid for its work.  On the strength of those promises, and in furtherance of its desire to see the project completed, Oracle kept its consultants working on the project through February 2014.

35.     In February 2014, however, Oracle advised Cover Oregon and Governor Kitzhaber that it would not continue to work indefinitely without Ordering Documents and payment.  By then, it had dedicated consulting services and other resources to the project worth at least an additional $68 million in reliance upon promises that Cover Oregon had yet to fulfill.

36.     Though Cover Oregon eventually paid the outstanding invoices and for a portion of the services provided from November 2013 through February 2014, Cover Oregon refused to execute Ordering Documents covering all the services provided or to compensate Oracle for the full value of the services rendered during that period.

37.     Oracle is informed and believes that Cover Oregon is using work product that Oracle's personnel produced and for which Cover Oregon has not paid, in violation of the terms of the OLSA.  Oracle is further informed and believes that Cover Oregon may have transferred Oracle's intellectual property to other parties, including OHA and/or DHS, also in violation of the terms of the OLSA and related agreements.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

38.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1 through 37 above and incorporates them by reference.

39.     Cover Oregon entered into written contracts with Oracle to pay for consulting services rendered on a time and materials basis, and it further agreed that it would not be entitled to use Oracle's work product without first paying for it.  Cover Oregon further agreed that it could not transfer Oracle's work product without Oracle's consent.

40.     Oracle performed services for Cover Oregon in accordance with the terms of its written agreements with that entity.

41.     Oracle has demanded payment for all of the services rendered to Cover Oregon, and by the filing of this Complaint hereby demands payment of the unpaid sums.  Cover Oregon has failed and refused, and it continues to fail and to refuse to pay for all of those services.

42.     Oracle is informed and believes and thereon alleges that Cover Oregon has continued to use Oracle's work product, and that it has transferred some or all of that work product to others, all in violation of the parties' written agreements.

43.     As of the filing of this Complaint, Oracle is informed and believes that Cover Oregon continues to use the Oracle software for which it has not paid in full, and it may have transferred that work product in violation of the terms of the parties' agreements.  Accordingly, as a direct and proximate result of Cover Oregon's breaches of contract as alleged herein, Oracle has sustained damages in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF

### (Quantum Meruit)

44.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1 through 43 above and incorporates them by reference.

45.     Cover Oregon requested services from Oracle related to the HIX Project, including but not limited to the development of software for the health insurance exchange application process and eligibility automation.  Cover Oregon agreed to pay Oracle for those services.

46.     Oracle provided the services Cover Oregon requested and in reliance upon Cover Oregon's promises to compensate Oracle for that work.  The reasonable value of those services, including not only Oracle's consultants, but also the other personnel it committed to the project, is at least $23 million.  Accordingly, Oracle is entitled to the reasonable value of the services Oracle performed for Cover Oregon for which Cover Oregon has not yet paid.

## PRAYER FOR RELIEF

**WHEREFORE,** Oracle prays for judgment against Cover Oregon as follows:

A.     entry of judgment in favor or Oracle against Cover Oregon on all claims for relief;

B.      an order of restitution in the amount equal to the reasonable value of the services Oracle provided Cover Oregon at Cover Oregon's request, and for which Oracle has not been paid;

C.      an order enjoining Cover Oregon, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with it, from continued acts in breach of the parties' written contracts;

D.      an order awarding Oracle damages it has sustained as a result of Cover Oregon's breaches in an amount according to proof;

E.      prejudgment interest at the statutory rate from the time payments came due; and

F.      any and all other legal and equitable relief as may be available under law the Court may deem proper.

## DEMAND FOR A JURY TRIAL

Oracle demands a jury trial for all issues so triable.

Respectfully submitted,

By: /s/ Brenna K. Legaard
_____

**Brenna K. Legaard, OSB #001658**
Email: blegaard@schwabe.com
**Jeffrey S. Eden, OSB #851903**
Email: jeden@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Facsimile: 503-796-2900

*Attorneys for Plaintiff*
Oracle America, Inc.

Dated: August  8,  2014

Page 21 - COMPLAINT FOR BREACH OF CONTRACT AND QUANTUM MERUIT