**Brenna K. Legaard, OSB #001658**
Email: blegaard@schwabe.com
**Jeffrey S. Eden, OSB #851903**
Email: jeden@schwabe.com
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 SW 5th Avenue, Suite 1900
Portland, OR  97204
Telephone: 503-222-9981
Facsimile: 503-796-2900

**Karen G. Johnson-McKewan**, *admitted pro hac vice*
Email: kjohnson-mckewan@orrick.com
**Robert S. Shwarts**, *admitted pro hac vice*
Email: rshwarts@orrick.com
**Erin M. Connell**, *admitted pro hac vice*
Email: econnell@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2625
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

**Dorian E. Daley**, *admitted pro hac vice*
Email: dorian.daley@oracle.com
**Deborah K. Miller**, *admitted pro hac vice*
Email: deborah.miller@oracle.com
**Peggy E. Bruggman**, *admitted pro hac vice*
Email: peggy.bruggman@oracle.com
ORACLE CORPORATION
LEGAL DEPARTMENT
500 Oracle Parkway
Redwood Shores, CA 94065
Telephone: 650-506-9534
Facsimile: 650-506-7114

Attorneys for Oracle America, Inc.

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ORACLE AMERICA, INC.,** a Delaware Corporation,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>**THE OREGON HEALTH INSURANCE EXCHANGE CORPORATION, dba COVER OREGON**, an Oregon Limited Liability Corporation; **THE STATE OF OREGON, BY AND THROUGH THE OREGON HEALTH AUTHORITY AND THE OREGON DEPARTMENT OF HUMAN SERVICES,** AND DOES 1-25, INCLUSIVE<br><br>　　　　　　　Defendants. | No. 3:14-cv-01279-BR<br><br>**CORRECTED FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) COPYRIGHT INFRINGEMENT**<br>**(2) BREACH OF CONTRACT;**<br>**(3) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; AND**<br>**(4) QUANTUM MERUIT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Oracle America, Inc. ("Oracle ") files this Corrected First Amended Complaint because the First Amended Complaint (Dkt. 18) mistakenly referred to the Oregon Department of Human Services as the Department of Health Services. This Corrected First Amended Complaint incorporates all exhibits appended to the First Amended Complaint (Dkt. 18) by reference. All references to exhibits herein refer to exhibits attached to the First Amended Complaint.

Oracle brings this Complaint against Defendant the Oregon Health Insurance Exchange Corporation, doing business as Cover Oregon ("Cover Oregon"), and Defendant the State of Oregon ("Oregon"), through its agencies the Oregon Health Authority ("OHA") and the Oregon

Department of Human Services ("DHS"), for copyright infringement, breach of contract, breach of the implied covenant of good faith and fair dealing, and *quantum meruit* based on Cover Oregon's continued use, distribution, and preparation of derivative works based on software developed by Oracle for which Cover Oregon has not paid as required under the parties' agreements.  Payment was an express condition to the licenses for the custom software that Oracle created, and the failure to pay means that Cover Oregon, OHA and DHS have no right to reproduce, prepare derivative works, distribute, or publicly display the software.

Oracle is a company with a 30-year history of successfully developing and implementing some of the most complex technical systems in the world, including the health insurance exchanges of at least a half dozen states.  Oregon hired Oracle—among many others—to help build Oregon's health insurance exchange, and Oracle worked at Oregon's direction on that project.  Since October 1, 2013, hundreds of thousands of Oregonians have been enrolled in health insurance or Medicaid through the use of the software that Oracle and others built.  That, however, is a fact most Oregonians do not understand because, when the press reported that the exchange was not accessible for consumer self-service on October 1, 2013, public officials chose not to give a measured, fully informed response.  Cover Oregon and public officials could have done two things in the face of those press reports:  (a) own up to the management and technical challenges they had encountered and commit to a plan for resolving them; or (b) blame someone else.  They chose the latter, and fixed their sights on Oracle.  While flogging Oracle publicly, Cover Oregon continued privately to ask for Oracle's help.  (Indeed, it continues to this day to seek Oracle's technical help with the project.)  Oracle gave that help for many months, in spite of the public excoriation, because it was committed to helping Cover Oregon complete the project

and because Cover Oregon repeatedly promised to pay Oracle for its services.  In the end,

though, Cover Oregon reneged on its promises, thus prompting this lawsuit.

Oracle seeks damages and any such other relief as the Court may deem proper.  Oracle

alleges the following based on personal knowledge and on information and belief as to the acts

of others:

## PARTIES

1.      Plaintiff Oracle is a subsidiary of Oracle Corporation, and is a Delaware

corporation whose principal place of business is Redwood City, California.  Oracle develops and

licenses certain intellectual property, including enterprise software programs and related

services.  Oracle is the world's leading supplier of enterprise hardware and software systems, and

related technical support and consulting services for those systems.  Oracle's enterprise software

includes the "Oracle Enterprise Architecture" solution, the "Oracle Policy Automation" solution,

and the "Siebel Customer Relationship Management" applications, all of which can be

customized to meet the needs of customers.

2.      On information and belief, Defendant Cover Oregon is an Oregon public

corporation under ORS 741.001(1) with its principal place of business at 16760 S.W. Upper

Boones Ferry Road, Suite 200, Durham, in Washington County, Oregon 97224.  Cover Oregon

does business in the District of Oregon.

3.      On information and belief, Defendant DHS is the agency of the state of Oregon

responsible for most of the state's social services programs.  Defendant OHA is the agency of the

state of Oregon responsible for managing most of the state's health care programs, including the

state's Medicaid program.  During at least a portion of the period relevant to this action, OHA

was a part of DHS, and entered into contracts with Oracle on behalf of both agencies.  Oracle is

informed and believes that OHA is now a fully separate and independent agency of the state of Oregon.

## JURISDICTION AND VENUE

4.      The Court has federal-question subject-matter jurisdiction under 28 U.S.C. § 1331 because the federal courts are vested with exclusive jurisdiction in copyright cases.  28 U.S.C. §1338(a).  The Court independently has diversity jurisdiction over the claims between Oracle and Cover Oregon because they are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.  Additionally and independently, this Court may properly exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a) because they are related to and form part of the same subject matter as the copyright claim.

5.      Venue in this District is appropriate because Cover Oregon has consented to venue in this District in its contract with Oracle, including the Oracle License and Services Agreement signed by the parties on or around March 14, 2013, in which Cover Oregon agreed:

> This agreement is governed by the substantive and procedural laws of Oregon and you and Oracle agree to submit to the exclusive jurisdiction of, and venue in, if in state Courts, in the Circuit Court of the State of Oregon for Marion County or, if in federal courts, the United States District Court for the District of Oregon, in any dispute arising out of or relating to this agreement.

Identical language appears in a separate agreement dated November 30, 2011, entered into between Oracle, on the one hand, and DHS and OHA, on the other.

6.      Venue in this District is also appropriate under 28 U.S.C. § 1391 as Cover Oregon is headquartered in Durham, in Washington County in Oregon.

Page 5 – CORRECTED FIRST AMENDED COMPLAINT

## FACTUAL ALLEGATIONS

### THE HISTORY OF THE OREGON HEALTH INSURANCE EXCHANGE PROJECT

7.      On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act ("ACA"), establishing the legal foundations for states to create health insurance exchanges by which individuals and small businesses could compare and purchase health insurance policies and, where eligible, obtain federal subsidies for premium payments.

8.      At the time the ACA was enacted, Oregon's DHS was already engaged in an ambitious information technology ("IT") project of its own to modernize its delivery of health and human services to low-income Oregonians.  DHS was preparing to undertake what it called its "Modernization Project" designed to upgrade DHS's Internet-based health and human services IT system, by which DHS would provide web accessibility, for both consumers and caseworkers, to its social services programs, such as the Supplemental Nutrition Assistance Program, Temporary Assistance for Needy Families, and Medicaid.

9.      In 2009, while the DHS's Modernization Project was in its early stages, the Oregon Legislature created the OHA to which it transferred some of the programs long resident under the DHS umbrella, including the state's health-related programs.  The transition was expected to take two years to complete, from 2009 to 2011.  As a result of that redistribution of work, the Modernization Project included elements of programming that spanned both agencies, necessitating substantial coordination between those two organizations and development of a shared administrative services system for the two entities.

10.      Passage of the ACA in the midst of the DHS/OHA transition presented Oregon with another massive technical and organizational challenge:  creating its own health insurance exchange.  Oregon decided not only to build its own exchange, but to integrate its exchange with

its to-be-modernized health and human services IT programs.  Oregon thus undertook two major

IT projects at once, at least one of which had no established template or precedent, and whose

legal parameters were still evolving and a work in progress.

11.    Oregon compounded the already high level of difficulty of its undertaking with at

least three more decisions:

(a)    Rather than engage the services of an experienced system integrator—in

effect, a general contractor to manage the massive project—Oregon decided to manage the

project by itself, despite having little or no experience with projects of such novelty, complexity,

or scale.  That decision was akin to an individual with no construction experience undertaking to

manage the processes of designing and building a massive multi-use downtown skyscraper

without an architect or general contractor, instead engaging *and managing* dozens of separate

subcontractors with different specialties to build different parts of the project.

(b)    Oregon was already developing the Modernization Project across two

bureaucracies—DHS and the recently created OHA—and added development of the health

insurance exchange to OHA's responsibilities.  Then, when OHA ran out of federal grant money

to build the exchange (which was then still very much a work in progress), it hastily transferred

responsibility for construction of the exchange to the newly created entity, Cover Oregon, which

had qualified for substantial federal grant money intended to sustain its *operation* of the

exchange.  Using funds supplied entirely from the federal government, Oregon thus undertook a

multi-part project of unprecedented size and complexity for which it had no expertise, divided

responsibility for its management and decision-making among multiple organizations, and

decided to forego hiring any experienced professionals to lead the project.  Oregon then abruptly

transferred the uncompleted work to a separate entity when the state ran out of federal money.  In

Page 7 – CORRECTED FIRST AMENDED COMPLAINT

other words, decisions about how to erect that downtown skyscraper without an architect or a general contractor were now going to be made by a *group* of inexperienced people who could not agree on how to make decisions, let alone which decisions were most important.  That same group of people was also going to direct the work of a large collection of subcontractors, each of whom played a different role in relation to the projects, and all of whose work required coordination.  Oracle was just one of many contractors engaged for these projects, a list that included Deloitte & Touche, Eagle Creek Software Services, Speridian Technologies, Point B Management Consultants, KPMG LLP, Maximus Inc., Cognosante, LLC, TahoeBlu, Inc., Purple Squirrel, Walsh & Associates, LLC, Wakely Consulting Group, Radha Consulting, and a variety of individual consultants.   (One of those contractors—Maximus, Inc.—was hired for the express purpose of enabling OHA, and later Cover Oregon, "to understand known and probable risks, and establish priorities for mitigation/remediation strategies."  Maximus dutifully reported on the risks, but OHA and Cover Oregon seemed largely to ignore the contents of those reports.)

       (c)    When OHA handed the health insurance exchange (sometimes referred to as "HIX") project to Cover Oregon just a few months before the October 1, 2013 open enrollment start date under the ACA, Cover Oregon decided that it would operate in a technological environment (comprised of hardware and software) that was entirely separate from that being used for the Modernization Project.   That decision alone caused substantial additional costs, weeks of delays, and wholly unnecessary additional complexity.  Oracle is informed and believes this decision was the direct result of bureaucratic dysfunction between DHS and OHA, and those two agencies' inability to work with the brand-new Cover Oregon.

Page 8 – CORRECTED FIRST AMENDED COMPLAINT

12.    Throughout the time that Oracle worked for DHS, OHA, and Cover Oregon, all of them ignored repeated warnings from Oracle and their own advisors that the project was in trouble for reasons only they could correct, including:

(a)    The government bureaucracies and Cover Oregon worked poorly together. They did not agree on work priorities, they competed with one another for resources and in decision-making, and they failed to provide authoritative direction to all of the contractors working on the project. Communications among the different entities were "ineffective and at times contentious," according to a report commissioned by Oregon's Governor John Kitzhaber. For example, at one point, OHA's Chief Information Officer complained to Oracle personnel that Cover Oregon's efforts were "becoming highly disruptive to the Modernization effort," and that her team felt "they are being run over" by Cover Oregon. As a result, one organization would make decisions without taking account of implications of that decision for the work being performed for the other organization; the result was often duplication of effort and rework. That dysfunction endured throughout the project. As late as mid-September 2013—just two weeks before the start of the federally-mandated open-enrollment period—Maximus issued a report in which it observed that the overall "business transformation/integration between OHA and CO is not being tracked like a formal project. Typically a project of this size would have specific governance reporting, charter, scope, tasks, milestones, deliverables, and deadlines for the interagency work that is to be accomplished both operationally and technically." The risk Maximus identified that flowed from this was that Cover Oregon could not be sure that the project would be implemented in the expected timeframe.

(b)    Cover Oregon failed to make timely decisions either alone, or with OHA and DHS, about the health insurance exchange's functional requirements, which serve to provide

the overall structure and scope of the IT project.  On a large project, it is critical for the system integrator to define functional requirements early on in the project and adhere to those requirements.  With Cover Oregon and the state agencies acting as the system integrator, the obligation to provide those functional requirements rested solely with them, and not with Oracle. Indeed, the organizations involved in the project could not even agree on a single process for defining those functional requirements.  In late January or early February 2012, a group of state employees took a 60-day "retreat" for the express purpose of articulating the project's requirements, and returned empty-handed.  The quality assurance consultant, Maximus, Inc., reported on the lack of fully-articulated requirements in its March 2012 report ("Requirements baseline should have been completed and approved by the customer at this phase in the project"). While Maximus characterized the 60-day retreat as "a step in the right direction," it expressed doubt about the likely efficacy of the effort, since it was not clear that key stakeholders at OHA or DHS were even involved.  By June 2012, Maximus reported:

> HIX Corp. [later known as Cover Oregon] did not perceive that requirements had been adequately defined and in early February of 2012, it was announced that they were undertaking an effort to define the business requirements. This effort was originally defined as a 60 day effort, but it has taken longer than originally stated and full requirement definition is not expected to conclude until mid to late June. To date, a detailed schedule of this effort has not been made available to the MAXIMUS Team and it is our understanding that it is under development.

13.     This failure to make (or stand by) essential decisions persisted for the duration of the project.  At one point, then interim director of Cover Oregon, Dr. Bruce Goldberg, confided to Oracle personnel that getting Cover Oregon personnel to make decisions was "like pushing a rope."

(a)       Cover Oregon and state agency representatives involved in the project changed their minds frequently about the work they wanted performed and how they wanted it completed, and did not follow appropriate channels within either their own decision-making organizations or the Oracle team to communicate desired changes.  Oracle software developers found themselves asked to perform on-the-spot code changes to meet *ad hoc* requests from Cover Oregon employees (a phenomenon Cover Oregon's Chief Technology Officer himself acknowledged was "short circuiting our processes"), and at least one Cover Oregon employee attempted to implement his own changes to otherwise final code.  The consequences of these uncontrolled changes and shifting priorities were entirely predictable.  Although Oracle attempted to persuade its customers to implement and enforce controls on its change processes, Cover Oregon did not heed Oracle's advice, and instead scolded Oracle for overstepping its bounds with respect to project management.  The following exchange between Oracle's Chief Corporate Architect, Edward Screven, and Cover Oregon's Chief Technology Officer, Garrett Reynolds is illustrative of the problem:

> From: Edward Screven [mailto: [*address redacted*]]
> Sent: Thursday, January 16, 2014 5:15 PM
> To: Reynolds Garrett
> Cc: Goldberg, Bruce; Karjala Aaron
> Subject: Urgent: Administrative Access to Siebel
>
> Garrett,
>
> Oracle employees on site in Durham report that in a meeting today you stated that you now have Siebel Administrator privilege, and you have used that privilege to directly make environment and application changes to the production environment.  Is this correct?
>
> Following established change control procedures is essential.  Making any change to production without following proper procedure puts the system at risk, both at the time of the change and later, during upgrades.  If you have made such changes, please

send a written description of each change, including when you made it. Also, please do not make any more changes.

From past email you have written, I gather you believe you understand Siebel so well that you can make changes on your own, without involving others or following process. But even trivial changes can result in confusion that leads to serious mistakes down the road, and even an expert can make mistakes. Recall that your proposed procedure to complete migration of data elements to data vault would have resulted data loss.

   - Edward

…

On 1/16/2014 6:28 PM, Reynolds Garrett wrote:

I thought Cover Oregon paid for and owned the system....
Thanks

B. Garrett Reynolds
Chief Technology Officer
Cover Oregon   |   *[redacted]*
*[redacted]*   |   *[redacted]*

14.    Cover Oregon had ample and repeated warnings that the healthcare exchange might not be fully functional for consumers on October 1, 2013, the date the state and federal insurance exchanges were required to go live under the ACA. Maximus issued monthly reports throughout most of the project to Cover Oregon, and warned about trouble with development of the insurance exchange from the start. For example, in March 2012, Maximus wrote:

Detailed and maintainable functional and technical requirements are critical to the success of the project. As of February 2012, gaps in requirements are unknown. There have been multiple attempts to clarify requirements, but as yet none have been adequate. In an attempt to address some of the past failed efforts, a new requirements process (called the '60-day' Requirements Process) was introduced on 02/08/12 and will be 'owned' by HIX Corporation rather than HIX-IT. Clearly articulating ownership of this process is a step in the right direction. However, the involvement of other stakeholders, including OHA and DHS, are

> *[sic]* not yet clear. Nor is there a way as yet to determine if the 60
> day time frame is realistic.

A year later, the March 2013 Maximus report still flagged the lack of solid requirements as a

risk:

> With the project deadline less than 1 year away and the lack of a
> stable and experienced organization, development and delivery
> teams within OHA as well as the requirements delay within [Cover
> Oregon], the probability of missing the target date is currently an
> issue.

In May of 2013, Cover Oregon's then-executive director, Rocky King, admitted requirements

were still not adequate and asked Oracle for help in finalizing the technical requirements:

> The on the ground Oracle team has informed Cover Oregon that
> we still need to tighten up requirements in some areas. When we
> looked into it, we found three areas where requirements still need
> to be fully developed. These include the back office customer
> service areas, some global user interface functions and security
> policies. When Cover Oregon looked into it further, we found that
> functional and technical design has not been fully updated since
> October of 2012. This poses issues with system integration testing,
> and also puts Cover Oregon at risk due to not having a fully
> documented system. Cover Oregon requests that Oracle helps to
> tighten up any remaining requirements as well as puts focus on
> completing technical documentation as soon as possible by
> bringing in additional resources. We do not want to divert the on-
> the-ground developers and analysts.

This request was an extraordinary one: Cover Oregon was the owner of the project and therefore

responsible for making decisions about what the exchange would and would not do.  The parties'

contracts made it abundantly clear that Oracle had *no role* in establishing the functional

requirements for the exchange, and Cover Oregon should have finalized them long before May

of 2013.

      15.    In late July 2013—just two months before the October 1, 2013 deadline—Oracle

made a presentation to the Cover Oregon board in which it explained that Cover Oregon *still* had

not completed its work on functional requirements for the exchange, and noted that there was only limited time remaining for final functional and integration testing.  Without finalized requirements and complete use cases, Oracle could perform only limited testing (with respect to the work and areas of the site that had been completed), but not end-to-end performance testing. The report to the Cover Oregon board stated that the project was at substantial risk.  The Maximus report for July reiterated that warning, putting the overall risk level for the project at "high."  It explained in its executive summary:

> Please note, that while progress was made during the month, the progress was not considered significant enough to lower the overall risk of the whole endeavor.  In other words, progress in some areas since last month is offset by the fact that there is one less month until the federally mandated deadlines.  Additionally, each rating category will carry a different relative weight when assessing the overall risk level of the effort. For example, while 10 out of 16 Quality Rating Categories are medium (yellow) or low (green), critical categories including "Scope," "Schedule," and "Inter-Org Coordination" remain high (red), which drives the overall high (red) risk assessment.

16.     Cover Oregon continued to ignore most of those warnings until virtually the eve of the deadline.  Just two weeks before the deadline, an Oracle consultant advised Cover Oregon's Chief Information Officer, Aaron Karjala, that it was time to stop issuing change orders, that two more change orders had just been "auto-approved" with demands for immediate implementation, and both were likely to create more problems than they solved.  The message reported:

> As we all knew would happen, as 10/1 approaches, stakeholders are starting to throw everything into the wheelbarrow with hopes of getting it in.  I'm also seeing [Cover Oregon] members coming down to the Training Room and interacting with the developers, speaking to these new requirements.  We've had the CR [change request] process for some time and though it's not without its flaws, it has been pretty functional in adding order to the requirements channel.  I feel like when we need that order most we

are abandoning it.  When the business walks downstairs and taps developers to talk new requirements with them it is a distraction at best and at worst we lose momentum and focus on priority items.

Maximus confirmed the truth of Oracle's complaint about Cover Oregon's ineffective change control process.  In its report issued two weeks before the October 1 deadline, Maximus reported that "[u]nauthorized changes are still making their way into the system."

17.    On September 18, 2013—mere *days* before the October 1 deadline—Cover Oregon's Executive Director still had not grasped the deep substantive challenges to going live that his organization had created in the development process.  He repeatedly conveyed concern about the "sizzle not the steak" of the massive IT project, as evidenced by a lengthy email he wrote to an Oracle consultant in which he described his desire to make the website *look* good, and apparently assumed the ongoing functional challenges would resolve themselves:

> Probably everyone will disagree with me[,] my staff, yours, consultants actually *[sic]* I know they would disagree with me – but step back and have a discussion with Aaron [Karjala].  Take a customer perspective rather than an IT perspective.  Again, I do not want to detract from the priority 1's that  must be done to go live 10/1 but damn, if the road is going to be be *[sic]* bumpy, <u>let me at least be driving a good looking car.</u>

(Emphasis in original.)

18.    Starting in late August 2013, Oracle added substantial additional resources to the project at Cover Oregon's request in hopes of accelerating the pace of work, instilling in the Cover Oregon employees a greater sense of discipline about completing requirements and use cases, and stopping the constant change orders, both formal and informal.  Over several months, Oracle committed, among others, its Chief Corporate Architect and members of his team, members of Oracle's "A Team" (a highly-specialized technical team comprised of enterprise architects, solution specialists, and software engineers), representatives of Oracle Laboratories,

members of the Testing and Release Management Teams, as well as additional subject matter experts in testing, release management, and the software products being deployed, to assist on the project. Cover Oregon's incapacity for lasting decision-making or project discipline, however, continued to frustrate Oracle's efforts at every turn. Nevertheless, Oracle continued to work at Cover Oregon's request, trying to drive the project to a conclusion.

19.    In the months leading up to October 1, and continuing thereafter, Oracle did its best to ensure that the most important pieces of the website—including eligibility determinations and actual enrollment into programs—worked for Oregonians during the open-enrollment period. At a high level, a fully-functioning exchange had to include four principal functions: (a) a "citizen self-service" portal; (b) a portal through which Community Partners and Agents, as well as Customer Service Representatives could gain access for customers; (c) eligibility determination and enrollment functions; and (d) "back-office" operations for billing. Of these, the most important were the second and third pieces that would enable insurance professionals to process applications for individual customers, assess their eligibility, and get them enrolled in plans. This is where Oracle tried to focus its efforts, often in spite of Cover Oregon's demands.

20.    Despite the project's technical and bureaucratic challenges, a website was produced that enabled Cover Oregon and the state's agencies to enroll more than 430,000 Oregonians in health insurance or Medicaid under the ACA, as Cover Oregon's management reported in June 2014. While the consumer-facing, self-service portal did not open during the initial open-enrollment period, Community Partners and Agents, and Customer Service Representatives were able to use the site to enroll Oregonians.

21.    By February 2014, a health insurance exchange website existed that included the citizen self-service functionality. Cover Oregon did not disclose that information to the public

and did not open the working self-service portal for individuals, for unexplained reasons of its

own.  Between February and mid-June, Oracle continued to work (at Cover Oregon's request) on

completing the back-office functionality and improving the other functionality that was already

in place.

22.     Cover Oregon's board of directors has since announced the intention to abandon

Cover Oregon's plan to provide a state-based HIX for Oregon, and has announced instead that it

has transferred Oracle's software code to the State of Oregon.

### THE SMEAR CAMPAIGN

23.     Though the State of Oregon and Cover Oregon succeeded in enrolling a very

large number of Oregonians in health care coverage, the failure to deliver a working citizen self-

service portal on October 1, 2013 was a political embarrassment for Governor Kitzhaber, who

immediately looked for places to lay the blame.  Among those who have lost their jobs at OHA

or Cover Oregon over this project are Carolyn Lawson, OHA's Chief Information Officer;

Rocky King, Cover Oregon's Executive Director; Bruce Goldberg, Cover Oregon's Interim

Executive Director; Aaron Karjala, Cover Oregon's Chief Technology Officer; and Triz

delaRosa, Cover Oregon's Chief Operating Officer.   Carolyn Lawson was the first to go, and

after destroying her professional reputation, the Governor quickly turned his sights on Oracle,

and set out systematically to vilify the company in the media.

24.     Ms. Lawson refused to accept her scapegoating quietly, however.  She issued a

tort claim notice on March 17, 2014 in which she alleged that several individuals associated with

Cover Oregon and OHA attempted to deflect responsibility for the problems with Cover Oregon

"by organizing, encouraging, allowing, tolerating and/or engaging in a substantial cover-up, the

purpose of which was to protect selected individuals … while unfairly and untruthfully pointing

the finger at others."  In that same notice, she went on to explain that the conspiracy she observed "centered on a 'core story'" that the exchange failed to launch properly for two reasons:  first, that Ms. Lawson had mismanaged it; and second, that "Oracle, which had been hired to build most of the Exchange's infrastructure, committed serious and fatal blunders in its work."  According to Ms. Lawson, when she declined to go along with the plan to blame Oracle, she was herself targeted.  Her tort claim notice alleges that one OHA employee told her, "'Somebody has to be held to blame for this—it's going to be Rocky [King], or it's going to be Oracle, or it's going to be you. *We want it to be Oracle*, but it can be you if you want.'" (Emphasis added.)

25.     While Oracle continued to work on the exchange at Cover Oregon's request, Governor Kitzhaber embarked upon a months-long campaign to blame Oracle for OHA's and Cover Oregon's mismanagement of the health insurance exchange project.  In furtherance of that campaign, Governor Kitzhaber held several interviews and press conferences during which he blamed and criticized Oracle for the problems with the exchange.  Critical to Governor Kitzhaber's scapegoating was the threat of litigation against Oracle.  During a January 9, 2014 press conference, for example, Governor Kitzhaber announced that he hired First Data to conduct an "independent assessment" of the Cover Oregon project, asserting First Data's report would determine, in part, whether Oregon would sue Oracle.  Cover Oregon privately continued to request Oracle's help.  Oracle, believing that the best solution for Oregonians was to focus on completing the project, continued to work, quietly and without public retort, in spite of the constant public slander.

26.     When First Data's report came out, it attributed a large part of the problems to Cover Oregon's mismanagement of the project, including its failure to hire a systems integrator.

Governor Kitzhaber admitted "oversight was a problem at Cover Oregon…" He later admitted in his May 29, 2014 letter to Attorney General Rosenblum that OHA's and Cover Oregon's "decisions contributed to the failure to deliver a working website…." These admissions did not slow his campaign against Oracle; in a March 20, 2014 press conference, Governor Kitzhaber again blamed Oracle for the Oregon Health Exchange project's shortcomings and repeated his threat to sue the company. His campaign culminated on May 29, 2014 when he made a surprise appearance before a committee of the Oregon Legislature excoriating Oracle for its work and demanding that the Attorney General file suit against Oracle. Even as the Governor threatened to sue Oracle, Cover Oregon continued to ask for Oracle's help and signed contract extensions, and Oracle continued to work. Indeed, on July 25, 2014, Cover Oregon contractors asked Oracle to supply personnel as subcontractors to assist them on the project, and Oracle continues today to render managed cloud services to Cover Oregon.

27.    Even after August 8, 2014, when Oracle filed its original complaint in this matter, and again after August 22, 2014—when the state finally filed its long-threatened lawsuit against Oracle—Cover Oregon, DHS, and OHA continued to seek Oracle's assistance with health insurance exchange-related projects.

### THE CONTRACTS

28.    The relationship between Oracle and Cover Oregon is defined by the contracts between them by which the parties defined their respective rights and responsibilities. Oracle has performed its obligations under those agreements, but Cover Oregon has not.

29.    As of April 30, 2013, OHA ran out of money for the insurance exchange project. Because Cover Oregon had received substantial federal funding to *run* the exchange, OHA and Cover Oregon agreed to transfer the exchange project ahead of schedule and, on or about May 1,

2013, Cover Oregon assumed ownership of the project and responsibility for managing the insurance exchange project and its many subcontractors from that point forward.

30.     In anticipation of transferring the health insurance exchange project to Cover Oregon, on or about March 14, 2013, Cover Oregon and Oracle entered into an Oracle License and Services Agreement ("OLSA"), a true and correct copy of which, including all amendments, is attached hereto as Exhibit A. Under the Cover Oregon OLSA (as under all prior agreements with DHS and OHA), Oracle owns all *copyrights* in the code developed and delivered pursuant to the OLSA.

31.     Under the Cover Oregon OLSA, Cover Oregon would receive—*upon payment for services*—a non-exclusive, non-assignable right to use the software Oracle developed and delivered to Cover Oregon under the OLSA:

> *Upon payment for services*, you have the non-exclusive, non-assignable, royalty free, perpetual, limited right to use for your internal business operations anything developed by Oracle and delivered to you under this agreement; however, certain deliverables may be subject to additional license terms provided in the ordering document.

(Emphasis added.)  (The same language appears in a November 30, 2011 OLSA that Oracle entered into with DHS and OHA before Cover Oregon took over responsibility for the HIX project, a contract that Oregon's Department of Justice also reviewed and approved.)

32.     Cover Oregon and Oracle also entered into an Amendment to the OLSA, containing among other terms, a "Source Code" provision stating that all source code Oracle delivered to Cover Oregon was subject to the terms of the OLSA and any application order and program documentation. The parties therefore intended that Oracle would own all intellectual property in the software developed pursuant to the OLSA, and that Cover Oregon would not obtain a right to use any of the software until it paid for Oracle's services. Oracle continued to

retain all ownership and intellectual property rights to the programs and software it developed and delivered to Cover Oregon.

33.     Pursuant to 17 U.S.C. §408 and associated regulations of the Copyright Office, Oracle has applied for registrations of copyright in certain new programs created and delivered pursuant to the services delivered under the OLSA as follows (collectively, the "Cover Oregon OLSA Copyright Assets"):

(a)     The original version of Siebel Health Insurance Exchange, Version 1.0.0.1 has been granted U.S. Copyright Registration No. TX 7-899-942.  The intermediate and final versions of Siebel Health Insurance Exchange as they were delivered to Cover Oregon have been granted U.S. Copyright Registration Nos. TX 7-899-948 and TX 7-899-944.  The final version of Siebel Health Insurance Exchange is a derivative work of the original version, and U.S. Copyright Registration No. TX 7-899-944 includes all improvements authored by Oracle and its subcontractors in the intervening versions.

(b)     The original version of Oracle Policy Automation Full Determination Eligibility Rulebase, Version 1.0.0.1, has been granted U.S. Copyright Registration No. TX 7-901-851.  The intermediate and final versions of Oracle Policy Automation Full Determination Eligibility Rulebase, as they were delivered to Cover Oregon, have been granted U.S. Copyright Registration Nos. TX 7-901-847 and TX 7-901-840.  The final version of Oracle Policy Automation Eligibility Benefit Application is a derivative work of the original version, US Copyright Registration No. TX 7-901-840 includes all improvements authored by Oracle and its subcontractors in the intervening versions.

(c)     On September 8, 2014, Oracle applied for registration of and the U.S. Copyright Office received a complete application including the complete application, fee, and

deposit for the original Oracle Policy Automation Eligibility Benefit Application, Version 1.0.0.1, and the subject application was granted Case No. 1-1727711042.  On the same date, Oracle applied for registration of, and the U.S. Copyright Office received complete applications, including applications, fees, and deposits, for the intermediate and final versions of the Oracle Policy Automation Eligibility Benefit Application, and those applications received Case Nos. 1-1727711114 and 1-1727711150.  The final version of Oracle Policy Automation Eligibility Benefit Application is a derivative work of the original version, and the application for registration of copyright thereof includes all improvements authored by Oracle and its subcontractors in the intervening versions.

(d)  On September 8, 2014, Oracle applied for and the U.S. Copyright Office received complete applications, including application, fee, and deposit, for registration of the original version of WebCenter Health Insurance Exchange Application, Version 1.0.0.1, and the subject application was granted Case. No. 1-1727711196.  On the same date, Oracle applied for registration of and the U.S. Copyright Office received complete applications, including applications, fees, and deposits, for the intermediate and final versions of WebCenter Health Insurance Exchange Application, and those applications received Case Nos. 1-1727711281 and 1-1727711318.  The final version of WebCenter Health Insurance Exchange Application is a derivative work of the original version, and the application for registration of copyright thereof includes all improvements authored by Oracle and its subcontractors in the intervening versions.

34.  Pursuant to a written inter-company agreement, Oracle has acquired all right, title, and interest in the copyright in the software code created under the OLSA for the Cover Oregon OLSA Copyright Assets.  Furthermore, such assignment includes all accrued and unaccrued

claims for infringement of copyright pertaining to such software code, including specifically the claim for infringement against Cover Oregon, OHA, and DHS.

35.     Cover Oregon also executed several "Ordering Documents" identifying the services Cover Oregon requested and the fees Cover Oregon had agreed to pay Oracle for those services.  As in the OLSA, Cover Oregon agreed in each Ordering Document that—*upon payment for services*—Cover Oregon would receive a non-exclusive, royalty-free license to the software Oracle developed for Cover Oregon:

> *Upon payment for services*, Cover Oregon shall have a royalty-free, nonexclusive, and irrevocable license for Cover Oregon and the U.S. Federal Government to reproduce, publish, or otherwise use anything developed and delivered under this Ordering Document resulting from the services provided hereunder and to the authorize others to do the same solely for the development and/or use of a government-operated health insurance exchange and eligibility automation system in accordance with the Affordable Health Care Act and applicable regulations of Federal purpose.  You shall not have any other rights in or to anything developed and delivered to you hereunder.

(Emphasis added.)  True and correct copies of the Ordering Documents for Oracle consulting services are attached hereto, collectively, as Exhibit B.

36.     Each Ordering Document also referenced and included a "Time and Materials Exhibit" ("T&M Exhibit"), identifying the specific services Cover Oregon had requested.  Under the T&M Exhibits, Cover Oregon agreed:  (a) Oracle would provide its services on a time-and-materials basis; (b) Cover Oregon would pay for all time spent performing such services; and (c) Oracle would "assist" Cover Oregon on the project, and work at Cover Oregon's sole direction.

37.     It is not unusual for consultants such as Oracle to work on a time-and-materials basis.  Indeed, many consultants, including Oracle, have done so on many projects, including

projects for public-sector customers.  The reason Oracle worked on a time-and-materials basis—

and not for a fixed fee—is a simple one.  While everyone involved understood the ultimate

objectives of the projects—to create a fully-functional, web-accessible, self-service health

insurance exchange, to modernize the State of Oregon's provision of its broader health and

human services offerings, and to integrate the multiple systems involved—Cover Oregon and the

state agencies DHS and OHA had no real plan for how, exactly, those projects would operate or

how they would work together.  Without a fixed scope for the project—the equivalent of

architectural blueprints—no contractor could reasonably be expected to agree to work on a fixed-

fee basis.  Because only DHS, OHA, and, ultimately, Cover Oregon, could resolve the

uncertainties regarding the overall scope and structure of the massive project, and because only

Cover Oregon, DHS, and OHA could demand changes in the project, those entities properly bore

the inherent risks associated with failing to resolve them in a timely way.

      38.     In about November 2013, Cover Oregon stopped paying its invoices and refused

to sign Ordering Documents for the services it had requested and was continuing to request from

Oracle, forcing Oracle to either risk working without payment or abandon the project.  By the

end of February 2014, Cover Oregon had executed Ordering Documents for Oracle consulting

services rendered through August 2013, but not for services rendered between then and the end

of February 2014.  In that period, at Cover Oregon's request, Oracle continued to render

consulting services to Cover Oregon, and committed substantial additional resources to the

project outside of its consulting organization, in the form of, among others, its Chief Corporate

Architect and members of his team, members of Oracle's A Team, representatives of Oracle

Laboratories, as well as additional subject matter experts in testing, release management, and the

products at issue.  Oracle repeatedly asked Cover Oregon to pay its outstanding invoices and

execute Ordering Documents for the work it was requesting so that Oracle could render invoices, and Cover Oregon promised on multiple occasions that it would do so. Governor Kitzhaber personally made multiple promises to Oracle that the company would be paid for its work. On the strength of those promises, and in furtherance of its desire to see the project completed, Oracle kept its consultants working on the project through February 2014.

39.    In February 2014, however, Oracle advised Cover Oregon and Governor Kitzhaber that it could not continue to work indefinitely without Ordering Documents and payment. By then, it had dedicated consulting services and other resources to the project worth at least an additional $68 million in reliance upon promises that Cover Oregon had yet to fulfill.

40.    Though Cover Oregon eventually paid the outstanding invoices and for a portion of the services provided from November 2013 through February 2014, Cover Oregon refused to execute Ordering Documents covering all the services provided or to compensate Oracle for the full value of the services rendered during that period. Cover Oregon's refusal to execute Ordering Documents prevented Oracle from issuing invoices for services rendered.

41.    Oracle is informed and believes that Cover Oregon is using copyrighted material that Oracle's personnel produced and for which Cover Oregon has not paid. Specifically, Cover Oregon is continuing to make available to the public a website which appears to include functionality delivered by Oracle for which it was not paid. Each time external users access and use that site, there is an unauthorized reproduction of the software code, and an unauthorized public display of the audiovisual work associated with Oracle's software code.

42.    Cover Oregon has also admitted that it has transferred part or all of the source code base to the State of Oregon for further development of additional functionality based on that code. Based on Oracle's past experience as described above, both OHA and DHS have

managed and controlled such development. Because Cover Oregon has not paid for the Cover

Oregon OLSA Copyright Assets code, it does not have the right to distribute that source code to

others. Because Cover Oregon has not paid for the code, it does not have the right to authorize

the preparation of derivative works based on Oracle's Cover Oregon OLSA Copyright Assets

source code. All of those entities and persons who are directing the preparation of a derivative

work based on an Oracle code base created and delivered under the OLSA are doing so in

violation of Oracle's exclusive right to prepare derivative works based on Cover Oregon OLSA

Copyright Assets.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement Against All Defendants)

43.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1

through 42, above, and incorporates them by reference.

44.     Oracle owns all right title and interest in the copyrights to the Cover Oregon

OLSA Copyright Assets software code, as well as all claims for infringement thereof.

45.     An express condition precedent to any license to Cover Oregon was that it was

required to pay for all services rendered under the OLSA. That express condition precedent has

not been satisfied because Cover Oregon has not paid for all of the services rendered under the

OLSA. Accordingly, Cover Oregon has no license at all for the Cover Oregon OLSA Copyright

Assets code and is not authorized to reproduce, prepare derivative works of, distribute, or

publicly display those works, or to authorize others to do so.

46.     By continuing to operate the Cover Oregon website, Cover Oregon is violating

Oracle's exclusive rights to reproduce and publicly display the work.

47.     By transferring source code to the control of OHA and DHS for further development, Cover Oregon has unlawfully distributed the Cover Oregon OLSA Copyright Assets work, and has unlawfully authorized others to prepare derivative works based on the Cover Oregon OLSA Copyright Assets work.

48.     By accepting the transfer of source code from Cover Oregon and exercising dominion and control over a project to augment that code, OHA and DHS have violated Oracle's exclusive rights to reproduce and to prepare derivative works of Cover Oregon OLSA Copyright Assets.

49.     Oracle has been actually and irreparably harmed by the actions of Cover Oregon in using, reproducing, distributing and preparing derivative works of the code without authorization.  Defendants have benefited from code for which they have not paid.  Furthermore, as detailed herein, Governor Kitzhaber has made Oracle the scapegoat for the State of Oregon's and Cover Oregon's failures, while at the same time demanding ongoing assistance from Oracle in the further development, delivery, and implementation of the Cover Oregon OLSA Copyright Assets code.  By continuing to use the code without authorization, and continuing to claim that the code is inadequate or defective, Defendants are continuing to injure Oracle in a manner that cannot fully be remedied at law.

50.     Accordingly, as a direct and proximate result of defendants' copyright infringement, Oracle has been damaged both economically and in terms of its reputation, and it will seek damages in an amount to be proven at trial, and such equitable relief as may be appropriate.

## SECOND CLAIM FOR RELIEF

**(Breach of Contract)**

**(As and for an alternative to the First Claim for Relief)**

**(Against Cover Oregon Only)**

51.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1 through 50, above, and incorporates them by reference.

52.     Cover Oregon entered into written contracts with Oracle to pay for consulting services rendered on a time-and-materials basis, and further agreed that it would not be entitled to use Oracle's work product without first paying for it.  Cover Oregon further agreed that it could not transfer Oracle's work product without Oracle's consent, unless authorized to do so pursuant to a more specific license contained in an Ordering Document between the parties.

53.     Oracle performed services for Cover Oregon in accordance with the terms of its written agreements with that entity.

54.     Oracle repeatedly has demanded that Cover Oregon execute Ordering Documents for the work Oracle has performed, so that Oracle may issue invoices to Cover Oregon for the work performed.  Oracle further has demanded payment for all of the services rendered to Cover Oregon, and by the filing of this Complaint hereby demands payment of the unpaid sums.  Cover Oregon has failed and refused, and continues to fail and to refuse, to execute Ordering Documents or otherwise to pay for all of the services Oracle has provided.

55.     Oracle is informed and believes and thereon alleges that Cover Oregon has continued to use Oracle's work product, and that it has transferred some or all of that work product to others.  Because Cover Oregon has not paid for all of Oracle's services, Cover Oregon's use and transfer of Oracle's work product violates the parties' written agreement.

56.     Accordingly, as a direct and proximate result of Cover Oregon's breaches of contract as alleged herein, Oracle has sustained damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

**(Against Cover Oregon Only)**

57.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1 through 56, above, and incorporates them by reference.

58.     Cover Oregon entered into written contracts with Oracle to pay for consulting services rendered on a time-and-materials basis.

59.     Oracle performed services for Cover Oregon in accordance with the terms of its written agreements with that entity.

60.     Under the OLSA, Oregon could not issue invoices and obtain payment absent Cover Oregon's execution of separate Ordering Documents.  Under the OLSA, Cover Oregon has an implied obligation to execute such Ordering Documents in order to obtain Oracle's services.  During the period between November 2013 and February 2014, Oracle rendered services at Cover Oregon's request, but Cover Oregon did not execute Ordering Documents to cover that work.

61.     Oracle repeatedly has demanded that Cover Oregon execute Ordering Documents for the work Oracle has performed, so that Oracle may issue invoices to Cover Oregon for the work performed.  Cover Oregon has failed and refused, and continues to fail and to refuse, to execute Ordering Documents or to otherwise pay for all of the services Oracle has provided.

62.     Cover Oregon's refusal to execute Ordering Documents so that Oracle can be paid is a breach of the implied covenant of good faith and fair dealing inherent in the OLSA as

amended.  This is particularly true where, as here, Cover Oregon continued to request the work and promised it would issue such documents, but did not do so.

63.     By promising that it would issue Ordering Documents for the requested work in order to induce Oracle to perform that work, and then failing to issue such documents, Cover Oregon has acted in bad faith, has abused its power and discretion under the OLSA, and has violated Oracle's reasonable expectations under the OLSA to be paid for all work performed for Cover Oregon.  By requesting such work and then refusing to issue the documentation necessary for payment, Cover Oregon has not only violated its implied obligations under the contract, but has frustrated Oracle's reasonable expectations and purpose under the OLSA.

64.     Accordingly, as a direct and proximate result of Cover Oregon's breaches of the implied covenant of good faith and fair dealing inherent in all contracts entered into under Oregon law, Oracle has sustained damages in an amount to be proven at trial.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**(*Quantum Meruit*)**

**(As and for an alternative to the First Claim for Relief)**

**(Against all Defendants)**

65.     Oracle hereby restates and realleges the allegations set forth in paragraphs 1 through 64, above, and incorporates them by reference.

66.     Cover Oregon requested services from Oracle related to the HIX Project, including but not limited to the development of software for the health insurance exchange application process and eligibility automation.  Cover Oregon agreed to pay Oracle for those services.  Accordingly, Oracle had a reasonable expectation that Cover Oregon would pay for

those services, and Cover Oregon reasonably should have expected to pay Oracle for those services.

67.    Oracle provided the services Cover Oregon requested and in reliance upon Cover Oregon's promises to compensate Oracle for that work.  Cover Oregon received the benefit of the services Oracle provided, and Cover Oregon was aware that it had received this benefit.

68.    Furthermore, OHA and DHS were fully aware of the terms of Oracle's OLSA with Cover Oregon, because they had entered into agreements of their own with Oracle in which Oracle conditioned licenses to its intellectual property upon complete payment.  That Cover Oregon has not paid Oracle for all of its services has been a matter of public knowledge for months.  OHA and DHS are, therefore, fully aware that they have no right to receive or use any part of the code that Oracle developed under the Cover Oregon OLSA.  OHA and DHS have nonetheless accepted delivery of the source code from Cover Oregon with full knowledge that Cover Oregon has not paid for the services rendered to create that source code.  OHA and DHS are, therefore, also unfairly benefiting from Oracle's services.

69.    The reasonable value of those services, including Oracle's consultants and the other personnel it committed to the project, is at least $23 million.  Accordingly, in order to avoid the injustice that otherwise will result, Oracle is entitled to the reasonable value for the services Oracle performed for Cover Oregon for which neither Cover Oregon nor the State has yet paid, despite their ongoing exercise of dominion and control over the fruits of Oracle's labor.

## PRAYER FOR RELIEF

**WHEREFORE,** Oracle prays for judgment against Defendants as follows:

A.    entry of judgment in favor or Oracle against Defendants on all claims for relief;

B.     an order of restitution against all Defendants in an amount equal to the reasonable value of the services Oracle provided, and for which Oracle has not been paid;

C.     an order enjoining Defendants, their officers, agents, servants, employees, attorneys, and affiliated companies, assigns and successors in interest, and those persons in active concert or participation with them, from continued acts of infringement of Oracle's intellectual property rights;

D.     an order awarding Oracle damages it has sustained as a result of Defendants' wrongdoing in an amount according to proof;

E.     prejudgment interest;

F.     attorneys' fees and costs pursuant to 17 U.S.C. §505; and

G.     any and all other legal and equitable relief as may be available under law and which the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Oracle demands a jury trial for all issues so triable.

Respectfully submitted,

Dated: September 17,  2014          By: /s/ Brenna K. Legaard
                                   **Brenna K. Legaard, OSB #001658**
                                   Email: blegaard@schwabe.com
                                   **Jeffrey S. Eden, OSB #851903**
                                   Email: jeden@schwabe.com
                                   SCHWABE, WILLIAMSON & WYATT, P.C.
                                   1211 SW 5th Avenue, Suite 1900
                                   Portland, OR  97204
                                   Telephone: 503-222-9981
                                   Facsimile: 503-796-2900

                                   *Attorneys for Plaintiff*
                                   Oracle America, Inc.